1  KRISTINA WILDEVELD, ESQ.
Nevada Bar No. 5825
2  LISA RASMUSSEN, ESQ.
Nevada Bar No. 7491
3  RICHARD BRYANT, ESQ
Nevada Bar No. 15511
4  **THE LAW OFFICE OF KRISTINA WILDEVELD & ASSOCIATES**
550 E. Charleston Blvd.,Suite A
5  Las Vegas, NV 89101
Phone (702) 222-0007
6  Fax (702) 222-0001
Lisa@Veldlaw.com, Richard@Veldlaw.com,
7  Kristina@Veldlaw.com

8  Attorneys for Plaintiff, Frank LaPena

9              **UNITED STATES DISTRICT COURT**
                      **DISTRICT OF NEVADA**
10

11

12  FRANK LAPENA,                        )  CASE NO. 2:21-cv-2170 JCM-NJK
                                         )  DEPT. NO.
           Plaintiff,                    )
13                                       )
    vs.                                  )  **FIRST AMENDED COMPLAINT AND**
14                                       )  **JURY DEMAND**
    LAS VEGAS METROPOLITAN POLICE        )
15  DEPARTMENT, a government entity;     )
    CLARK COUNTY, a political subdivision )
16  of the State of Nevada and Government )
    Entity; CHARLES LEE, an Individual and )
17  Police Officer and District Attorney )
    Investigator; the Estate of CHARLES LEE; )
18  BEECHER AVANTS, an Individual and    )
    Police Officer and District Attorney )
19  Investigator; the Estate of BEECHER  )
    AVANTS; MICHELE WHITNEY, an          )
20  Individual and Police Officer; O.R. "Ray" )
    LYONS, an Individual and Police Officer; )
21  JERRY KELLER, an Individual and      )
    Sheriff, in his individual and official )
22  capacities; DAVID SCHWARTZ, an       )
    Individual and Prosecutor; MELVYN    )
23  HARMON, an individual and Prosecutor; )
    the Estate of MELVYN HARMON;         )
24  CLARK PETERSON, an individual and    )
    Prosecutor; PAMELA WECKERLY, an      )
25  individual and Prosecutor; MARC      )
    DIGIACOMO, an individual and         )
26  Prosecutor; BOB MILLER, an Individual )
    and District Attorney; STEWART BELL, )
27  an Individual and District Attorney; )
28

1

DAVID ROGER, an )
individual, Prosecutor and District )
Attorney; STEVE WOLFSON, an )
individual and District Attorney; )
)
        Defendants. )
)
)
)
)
)

## FIRST AMENDED COMPLAINT AND JURY DEMAND

Plaintiff, Frank LaPena (herein after "LaPena" or "Plaintiff", by and through his attorneys, Lisa Rasmussen and Richard Bryant from the Law Offices of Kristina Wildeveld and Associates and alleges as follows:

### Introduction

1.    Plaintiff, Frank LaPena, was wrongfully convicted for the 1974 murder of Hilda Krause—a crime he did not commit. Arrested in 1974, and between his periods of wrongful incarceration LaPena spent over 23 years in prison, collectively, before he was exonerated on November 6, 2019.

2.    Mr. LaPena's 2019 exoneration was granted as a general pardon based on his actual innocence, after it was shown through DNA testing and evidentiary testimony confirmed that key witnesses had offered perjured testimony against LaPena that led to his conviction. The Board unanimously granted LaPena a pardon.

3.    LaPena's wrongful conviction was no accident. Rather, it was the result of misconduct by Defendant Officers and Deputy Attorneys who abused and mis-used their investigative powers and responsibilities and ability to offer and retract plea agreements to coerce testimony from Gerald Weakland (herein after Weakland), the actual murderer of Mrs. Krause.

4.    Specifically, Defendants decided to pursue LaPena as a suspect because doing so enabled them to take their focus off of Marvin Krause, the victim's husband, who for

reasons unknown, law enforcement and the district attorney's office did not want to pursue. Defendants accomplished this by ignoring and concealing evidence from the initial report and statements from both the confidential informant (later identified as Joey Costanza, (herein Costanza)), and Weakland himself and by leveraging the first-degree murder charge against Weakland to cause Weakland to make false statements and testimony against LaPena.

5.    Mr. LaPena has consistently and adamantly maintained his innocence of Hilda's murder and all other acts associated therewith.

6.    The Las Vegas Metropolitan Police Department (herein after "LVMPD") Detectives' misconduct in securing Weakland's false statement caused LaPena to be arrested and convicted of Hilda Krause's murder. LaPena was sentence to life without parole plus a concurrent sentence of thirty years total for robbery with a deadly weapon enhancement.

7.    The misconduct in LaPena's case was part of a larger pattern of police and prosecutor misconduct, including coercion and the fabrication of false evidence against Mr. LaPena as well as the suppression of exculpatory evidence of which defendants were aware. That pattern has not stopped between 1974 and today's date, in fact there are many instances where it can be established that it continues without interruption.

8.    Through this civil rights action, pursuant to 42 U.S.C. and § 1983 and Nevada law, LaPena seeks to bring Defendants' misconduct to light and to ensure they are held accountable for their actions. LaPena also seeks justice for the lost of the many prime years of his life due to his unjust conviction.  He seeks compensation for his damages, all of which are well in excess of $100,000.

**Jurisdiction and Venue**

9.    This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of LaPena's rights as secured by the United States Constitution.  Mr. LaPena also alleges claims in violation of state law and common law.

10.    Venue is proper in the Eighth Judicial District Court because, upon information and belief, most of the individual defendants reside within this district, and events giving rise to the claims asserted herein occurred within this district.

11.    Venue is also proper in the United States District Court, District of Nevada, pursuant to 28 U.S.C. 1331, 1441 and 1446, though Mr. LaPena does not waive his right to seek remand to the Eighth Judicial District Court should the same be appropriate.

12.    Plaintiff respectfully demands a trial by jury on all issues and claims set forth in this Complaint.

**The Parties**

13.    Plaintiff FRANK LAPENA is currently 83 years old and lives in Henderson, Nevada, situated within Clark County, Nevada. At the time of Hilda Krause's murder, LaPena was 36 years old where he lived and worked in Clark County, Nevada.

14.    Defendant LAS VEGAS METROPOLITAN POLICE DEPARTMENT, (hereinafter LVMPD), is a government entity formed pursuant to state and county authority, is a subdivision of Defendant CLARK COUNTY and is the appropriate defendant for LAPENA'S claims herein under Title 42, United States Code, Section 1983 and was at all times relevant to this action, the employer of CHARLES LEE, BEECHER AVANTS, MICHELE WHITNEY, O.R. "RAY" LYONS, JERRY KELLER, RALPH LAMB, JOHN MORAN, and GEORGE HOLT, and thus is responsible under a theory of respondeat superior under state law as well.

15.    Defendant CLARK COUNTY is and was at all times hereto a political subdivision of the State of Nevada and government entity which is formed and operated pursuant to the Nevada Revised Statutes. At all times relevant to the Complaint,  LVMPD and the Clark County District Attorney's Office (hereinafter "CCDA") were subdivisions of CLARK COUNTY.  Clark County employed all defendants named herein.

16.    Defendant CHARLES LEE is and was at all times relevant hereto a detective employed by  LVMPD and/or an investigator in the CCDA, both located in Las Vegas, Nevada   His present residence is unknown at this time. At all times relevant hereto, Defendant LEE  acted under color of law and in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, regulations, policies and customs, and

usage for the LVMPD and CCDA. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

17.    Upon information and belief, CHARLES LEE may be deceased. Defendant the ESTATE OF CHARLES LEE is named in the event that CHARLES LEE is in fact deceased.

18.    Defendant BEECHER AVANTS is and was at all times relevant hereto a detective employed by LVMPD and/or an investigator employed by the CCDA, both located in Las Vegas, Nevada. His present residence is unknown at this time. At all times relevant hereto, Defendant AVANTS acted under color of law and in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, regulations, policies and customs, and usage for the LVMPD and the CCDA. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

19.    Upon information and belief, BEECHER AVANTS may be deceased. Defendant the ESTATE OF BEECHER AVANTS is named in the event that BEECHER AVANTS is in fact deceased.

20.    Defendant O.R. "Ray" LYONS is and was at all times relevant hereto an officer employed by LVMPD in Las Vegas, Nevada. His present residence is unknown at this time. At all times relevant hereto, Defendant LYONS acted under color of law and in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, regulations, policies and customs, and usage for the Las Vegas Metropolitan Police Department. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

21.    Defendant MICHELE WHITNEY is and was at all times relevant to this Complaint a Metro Intelligence Detective with LVMPD in Las Vegas, Nevada. His present residence is unknown at this time. At all times relevant hereto, Defendant Whitney acted under color of law and in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, regulations, policies and customs, and usage for the Las

Vegas Metropolitan Police Department. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

22.   Defendant JERRY KELLER is and was at all times relevant hereto employed as either a criminalist for Defendant LVMPD, an officer for LVMPD, a supervising officer for LVMPD and/or as Sheriff of LVMPD in Las Vegas, Nevada.  His present residence is unknown at this time.  At all times relevant hereto Defendant KELLER acted under color of law and in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, regulations, policies and customs, and usage for the Las Vegas Metropolitan Police Department. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.  Further, KELLER is sued in his official capacity as an organizational supervisor who had control over policy and who maintained supervising decision-making power over others employed by LVMPD who are relevant to this Complaint.

23.   Defendant DAVID SCHWARTZ is and was at all times relevant hereto employed as a prosecuting attorney for the CCDA in Las Vegas, Nevada. Upon information and belief SCHWARTZ resides in Clark County, Nevada.  Defendant SCHWARTZ acted under color of law and in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, regulations, policies and customs, and usage for the Clark County District Attorney's Office. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

24.   Defendant BOB MILLER is and was employed as the District Attorney in Clark County, Nevada from 1978 through 1986, or as a supervising attorney for the CCDA prior to that, all of which is located in Las Vegas, Nevada.  Upon information and belief, MILLER resides in Clark County, Nevada.  Defendant MILLER acted under color of law and in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, regulations, policies and customs, and usage for the Clark County District Attorney's Office. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.  Further, MILLER is sued in his

1    official capacity as an organizational supervisor who had control over policy and who

2    maintained supervising decision-making power over others employed by CCDA who are

3    relevant to this Complaint.

4         25.    Defendant MELVYN HARMON is and was at all times relevant hereto

5    employed as a prosecuting attorney for the CCDA in Las Vegas, Nevada. HARMON'S

6    residence is unknown. Defendant HARMON acted under color of law and in his individual

7    capacity within the scope of his employment pursuant to the statutes, ordinances, regulations,

8    policies and customs, and usage for the Clark County District Attorney's Office. Upon

9    information and belief, he is entitled to indemnification under statute and by contract. He is

10    sued in his individual capacity.

11         26.    Upon information and belief, MELVYN HARMON may be deceased.

12    Defendant the ESTATE OF MELVYN HARMON is named in the event that MELVYN

13    HARMON is in fact deceased.

14         27.    Defendant PAMELA WECKERLY is and was employed by the CCDA

15    during the proceedings undertaken between 2011 and 2017 in Las Vegas, Nevada. Upon

16    information and belief WECKERLY resides in Clark County, Nevada. Defendant

17    WECKERLY acted under color of law and in her individual capacity within the scope of her

18    employment pursuant to the statutes, ordinances, regulations, policies and customs, and

19    usage for the Clark County District Attorney's Office. Upon information and belief, she is

20    entitled to indemnification under statute and by contract. She is sued in her individual

21    capacity.

22         28.    Defendant MARC DIGIACOMO is and was employed by the CCDA during

23    the proceedings undertaken between 2011 and 2017 in Las Vegas, Nevada. Upon information

24    and belief DIGIACOMO resides in Clark County, Nevada. Defendant DIGIACOMO acted

25    under color of law and in his individual capacity within the scope of his employment

26    pursuant to the statutes, ordinances, regulations, policies and customs, and usage for the

27    Clark County District Attorney's Office. Upon information and belief, he is entitled to

28    indemnification under statute and by contract. He is sued in his individual capacity.

29.     Defendant CLARK PETERSON is and was employed by the CCDA when Mr. LaPena sought a pardon and/or commutation his life sentence in 2001 and PETERSON appeared before the Nevada Pardons Board in 2003 to oppose the requested relief sought by Mr. LaPena. Between 2001 and 2003, PETERSON was employed as a deputy district attorney by the CCDA.  Upon information and belief, PETERSON resides in the state of Idaho.  Defendant PETERSON acted under color of law and in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, regulations, policies and customs, and usage for the Clark County District Attorney's Office. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

30.     Defendant STEWART BELL is and was employed as the District Attorney in Clark County, Nevada from 1995 through 2002, or as a supervising attorney for the CCDA prior to that, all of which is located in Las Vegas, Nevada.  Upon information and belief, BELL resides in Clark County, Nevada.  Defendant BELL acted under color of law and in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, regulations, policies and customs, and usage for the Clark County District Attorney's Office. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.  Further, BELL is sued in his official capacity as an organizational supervisor who had control over policy and who maintained supervising decision-making power over others employed by CCDA who are relevant to this Complaint.

31.     Defendant DAVID ROGER is and was employed as the District Attorney in Clark County, Nevada from 2003 through 2012, or as a supervising attorney for the CCDA prior to that, all of which is located in Las Vegas, Nevada.  Upon information and belief, ROGER resides in Clark County, Nevada.  Defendant ROGER acted under color of law and in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, regulations, policies and customs, and usage for the Clark County District Attorney's Office. Upon information and belief, he is entitled to indemnification under

statute and by contract. He is sued in his individual capacity. Further, ROGER is sued in his official capacity as an organizational supervisor who had control over policy and who maintained supervising decision-making power over others employed by CCDA who are relevant to this Complaint.

32.     Defendant STEVEN WOLFSON is and was employed as the District Attorney in Clark County, Nevada from 2012 through the conclusion of Mr. LaPena's state court proceedings which concluded in 2017, and the CCDA is located in Las Vegas, Nevada. WOLFSON resides in Clark County, Nevada. Defendant WOLFSON acted under color of law and in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, regulations, policies and customs, and usage for the Clark County District Attorney's Office. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity. Further, WOLFSON is sued in his official capacity as an organizational supervisor who had control over policy and who maintained supervising decision-making power over others employed by CCDA who are relevant to this Complaint.

33.     Plaintiff has complied with the requirements of Nevada state law NRS § 41.036(2). LaPena made and served LVMPD, The Clark County District Attorney, Clark County and the Attorney General of Nevada with notice of Mr. LaPena's claims on November 1, 2021. No offers of settlement of been made.

**Procedural Background**

34.     In April 1974, LaPena was arrested for Capital Murder and Robbery, Use of a Deadly Weapon in Commission of a Crime for the murder and robbery of Hilda Krause. LaPena was thirty-six years old at the time of his arrest. LaPena pled not guilty.

35.     On April 9, 1977, a jury found LaPena guilty of First-Degree Murder and Robbery, Use of Weapon in Commission of a Crime. On May 19, 1977, Eighth Judicial District Court Judge J. Charles Thompson sentenced LaPena to life without parole for murder, plus a concurrent sentence of 30 years total for the robbery and deadly weapon enhancement.

36.    LaPena appealed his conviction; the Nevada Supreme Court reversed his conviction on April 21, 1982. Pursuant to the reversal, LaPena's first period of wrongful incarceration ended on May 20, 1982.

37.    LaPena was retried and convicted by jury in May 1989, and he returned to prison of his own accord on June 29, 1989. On July 13, 1989, Eighth Judicial District Court Judge Thomas Foley imposed the same sentence as before - life without parole, plus a concurrent sentence of 30 years total. LaPena appealed his conviction again and this time, the Nevada Supreme Court affirmed his conviction.

38.    In June 1992, LaPena filed a petition for post-conviction relief. This Court denied his petition without conducting an evidentiary hearing. On appeal, the Nevada Supreme Court remanded the matter for an evidentiary hearing.

39.    LaPena also filed a motion to dismiss based on lack of evidence and he made a claim of factual innocence. This motion to dismiss was subsequently consolidated with his petition for post-conviction relief.

40.    The Eighth Judicial District court conducted a four-day evidentiary hearing in October 1995. The court ultimately denied his motion to dismiss the indictment but granted LaPena's petition, vacating his conviction and sentence. LaPena was released from custody on bail on June 6, 1997. This ended LaPena's second period of incarceration.

41.    The district attorney's office appealed the grant of the petition for writ of habeas corpus, and LaPena cross-appealed the denial of his motion to dismiss the indictment.

42.    In 1998, the Nevada Supreme Court reversed the lower Court's order granting the petition for writ of habeas corpus and affirmed the denial of the motion to dismiss. The reversal reinstated LaPena's conviction and he self-surrendered to the Nevada Department of Corrections (NDOC) on December 15, 1998.

43.    In 2003, LaPena sought a sentence commutation from the Nevada Board of Pardons Commissioners (Board). The Board commuted his sentence from life without parole to life with parole on December 12, 2003. The Nevada Board of Parole Commissioners

granted LaPena parole and the NDOC released him from custody on February 8, 2005. This ended LaPena's third period of incarceration and started LaPena's term of parole.

44.    In 2011, Mr. LaPena filed a Post-Conviction Petition requesting genetic marker DNA analysis of evidence within the possession of custody of the state of Nevada. An evidentiary hearing was held in 2017 and a decision and ordered was entered on that petition in August 2017.

45.    In 2019, LaPena sought a general pardon based on actual innocence. The Board pardoned LaPena on November 6, 2019. This ended LaPena's term of parole.

46.    In June 2021, the Eighth Judicial District Court issued a Certificate of Innocence to Mr. LaPena and entered an order awarding him statutory and compensatory damages pursuant to NRS §41.940, et seq.

47.    Damages totaling just under $2,000,000 were paid to Mr. LaPena by the state of Nevada in August 2021 and pursuant to the statute that authorizes payment to Mr. LaPena from the state, the state shall be reimbursed from the net proceeds of any other claims Mr. LaPena successfully prosecutes outside of the wrongful conviction compensation statute, codified at Chapter 41 of the Nevada Revised Statutes.

### Factual Background

48.    Frank LaPena was born in 1938 in New York City. Frank was born three (3) months premature and had several major health situations growing up, including a burst belly button, a car accident, and being diagnosed with Polio all by the age of three (3) years old. Beyond his health challenges, Frank had a difficult childhood as his father was violent and abusive towards both Frank and his family before his father finally abandoned them when Frank was 14 years old.

49.    Frank worked multiple jobs to help support his family while growing up, including a neighborhood paper route, as a gas station attendant, and a job setting up bowling pins.

50.    Despite these challenges LaPena was able to complete high school education while actively playing many sports including football, basketball, baseball, and track. After

high school, Frank enlisted in the United States military at the age of 18, and served in the Infantry Division in Fort Benning, Georgia for two (2) years before receiving an honorable discharge due to his history with Polio.

51.    Before his arrest, Mr. LaPena was living a happy and productive life in Las Vegas, Nevada. Mr. LaPena worked as a bellman from 1964 to 1974 and was working as a bell captain at the Hacienda Resort Hotel and Casino in 1974.

52.    Mr. LaPena was dating Rosalie Maxwell (hereinafter "Rosalie") at various times relevant hereto.

53.    Upon discovering that Rosalie was also dating Marvin Krause, Mr. LaPena ended their relationship, but the two later began dating again.

## The Murder of Hilda Krause

54.    On the early morning of January 14, 1974, Marvin Krause (herein "Marvin") opened his garage to leave for work and was immediately confronted by Gerald Weakland (herein "Weakland") & Thomas Boutwell (herein "Boutwell") wearing gloves and dark stockings on their heads to mask their identities. One (1) of the men pointed a gun at Marvin and demanded he go back in his house and get his wife, Hilda Krause (herein "Hilda").

55.    The couple was forced to lie on the floor, tied up, and were then separated into different bedrooms. One (1) man robbed Marvin and hit him in the head knocking him unconscious.

56.    While unconscious, Hilda was gaged with a scarf, had her throat slit, and was left face down on the floor with a knife sticking out of her back. Hilda was dead when the police arrived.

57.    An autopsy found that Mrs. Krause was strangled with a cord or rope prior to her throat being slit; she was also stabbed in the neck several times after her throat was slit.

58.    Mr. Krause reported that the assailants were two Caucasian men who attacked him after he opened his garage to go to work. Mr. Krause suffered a head injury in the attack. He died the following year of unrelated causes.

**LVMPD and CCDA's Office Corrupt Investigation**

59.    A few days after the murder, Joey Costanza (herein "Costanza"), a confidential informant for the Las Vegas Metropolitan Police, contacted the Defendant detective WHITNEY. Costanza told WHITNEY that several weeks prior to the murder a Caesar's palace pool attendant named Gerald Weakland asked Costanza if he wanted to help him rob and kill someone who worked at Caesar's Palace.  Costanza further told police that Thomas Boutwell, and Bobby Webb may have also been involved in the murder.

60.    After initial questioning by police, only Weakland was arrested.  Weakland made a statement incriminating himself and two (2) others, but this statement was concealed for many, many years.

61.    In total, Weakland made three statements about the murder, but only two statements were disclosed to LaPena throughout his proceedings.

62.    The first statement was taken by WHITNEY the second statement by AVANTS and LEE and the third statement by AVANTS, LEE, HARMON, O.R. LYONS and others in the Clark County District Attorney's Office.

63.    AVANTS and LEE investigated the murder.   AVANTS was a lieutenant in charge of the homicide section of LVMPD at that time and he alter became an investigator with the CCDA.

64.    AVANTS gave personal assistance to the assigned homicide detectives, and he knew Hilda and Marvin Krause socially, and from their jobs as well as from being around Caesar's Palace.

65.    LEE was employed by LVMPD from 1968 through 1983 and then he went to work for the CCDA as an investigator.  He was assigned to the homicide investigation of Hilda Krause when employed by LVMPD and he was the "lead investigator."

66.    LEE knew that Weakland was developing as a lead suspect from information he learned from WHITNEY.

67.    WHITNEY was the LVMPD intelligence officer who obtained information from Costanza in exchange for favors/benefits to Costanza which have still never been entirely exposed.

68.    WHITNEY knew that LaPena had never been referenced by Costanza, but Weakland and two others were.

69.    WHITNEY helped conceal the original statement given by Weakland and upon information and belief, he did so at the request of AVANTS and LEE.

70.    Based on information from Costanza, LEE contacted Weakland three or four times before Weakland was arrested for the murder of Hilda Krause.  On each of those occasions, Weakland never implicated or mentioned LaPena.

71.    On March 29, 1974, Weakland appeared for his preliminary hearing.  He asked if he could cooperate in exchange for leniency. Present for Weakland's "statement," which took place in the Clark County District Attorney's Office, were:  Michael Cherry, then Assistant Public Defender for Weakland; Howard Ecker, Deputy Public Defender for Weakland; Melvyn HARMON, Chief Deputy District Attorney of the CCDA; Robert Wolf, Deputy District Attorney of the CCDA; Lieutenant Charles Bourne, an investigator from the CCDA; Lieutenant Beecher AVANTS of LVMPD; Detective Ray LYONS of LVMPD; Detective Charles LEE of LVMPD and Gerald Weakland.

72.    Weakland admitted to the crimes on March 29, 1974, and as part of his "statement" about what happened, he told prosecutors and detectives that LaPena and Rosalie asked him to murder Hilda. In exchange for his testimony that LaPena and Rosalie Maxwell hired him to kill Hilda, Weakland received an amended Second-Degree Murder charged with a sentence of Life with parole eligibility after serving five (5) years. All other charges against Weakland were dropped.

73.    In his third statement, Weakland told police that he owed LaPena money, and that LaPena told him his debt would be forgiven and he would be paid a large sum of money if Weakland killed Hilda and made it look like a robbery.

74.    Weakland testified that LaPena and Rosalie hired him so that Rosalie could marry Marvin, and LaPena and Rosalie, who were previously in a dating relationship, could inherit Marvin's estate.

75.    LaPena was arrested based on Weakland's statement.

76.    AVANTS knew that the statements of Weakland did not match the crime scene evidence.

77.    Prior to Weakland's March 28, 1974 "statement," Marvin Krause was a possible suspect.  After Weakland's statement, law enforcement disregarded Marvin Krause entirely in order to focus on LaPena and Maxwell.  This was convenient for AVANTS as he was personally acquainted with Marvin and Hilda Krause.

78.    LaPena, who was charged with and convicted of one (1) count of First-Degree Murder and one (1) count of Robbery with Use of a Deadly Weapon, is completely innocent of the murder of Hilda Krause.

79.    LaPena was not present at Marvin and Hilda's house on the morning of January 14th and did not rob Marvin or murder Hilda Krause.

80.    LaPena did not hire, cajole or encourage Weakland, or anyone else, to rob and/or murder Marvin or Hilda.

81.    LaPena's wrongful conviction was no accident. Rather it was the result of misconduct by the cited Defendants' who were participants that engaged or acted jointly or in concert in initiating and furthering the object of a continuing pattern of conspiracy & resulting overt acts by conspiring directly or individually each with one another as a continuing enterprise unit or individual enterprise in the obstruction of justice.

82.     By concealing the existence of an eyewitness/information; the identity of the eyewitness/C.I.; the information elicited from the C.I (Costanza).; and using every conceivable unlawful, intentional & malicious act by impeding, hindering, obstructing & preventing Plaintiff in his attempts to obtain Costanza's depositions and testimony, the defendants precluded and obstructed the truth of the murder of Hilda Krause and the fact that LaPena was not involved in her murder in any way.

83. For at least 18 years the defendants held a secret agreement with the Costanza (who possessed a long criminal record) that as long as he agreed not to give his deposition/testimony on Plaintiff's behalf & stay elusive in Plaintiff's attempts to depose him, he would be assisted by the Defendants for his past/pending & future crimes he committed.

84. For many years, the defendants concealed meetings with Weakland at the prison, benefits to Weakland and other relevant information that had been provided to them by Costanza.

85. For over 40 years, the CCDA opposed any and all relief sought by Mr. LaPena and continued to argue that he was responsible for the crimes which he has now been deemed innocent.

86. The CCDA withheld Weakland's original statements, worked in concert with LVMPD to squeeze off LaPena's access to Costanza, and on the occasions that Mr. LaPena was granted some form of relief, it sought LaPena's admission to offenses he did not commit, threatening him each time with a life sentence.

87. STEWART BELL was the District Attorney for Clark County from 1995 to 2002. He supervised and was responsible for training prosecutor HARMON and others during this time period. HARMON and SCHWARTZ continued to vigorously litigate against Mr. LaPena in post-conviction proceedings and in proceedings relating to Costanza, including during the proceedings before Judge Porter that took place between 1995 and 1998.

88. On one occasion during this time period, LaPena gave BELL a ride in his (LaPena's car). BELL told LaPena he knew he (LaPena) was innocent. Despite this knowledge, BELL and his deputy district attorneys, including HARMON and SCHWARTZ, continued to argue against any relief for LaPena in his post conviction proceedings between 1995 and 1998.

89. ROGER was the District Attorney for Clark County from 2003 to 2012. He supervised and was responsible for training prosecutors PETERSON, WECKERLY and

DIGIACOMO and others during this time period and prior to that time period, though not as the District Attorney.

90.    ROGER directed Peterson to oppose Mr. LaPena's 2003 pardon/commutation request.    PETERSON opposed the relief sought by Mr. LaPena at his pardon/commutation hearing in 2003, despite evidence that LaPena was actually innocent of the crimes charged, including evidence from a retired Supreme Court Justice..

91.    ROGER directed WECKERLY AND DIGIACOMO to oppose Mr. LaPena's request for relief filed in 2011.  WECKERLY AND DIGIACOMO did oppose Mr. LaPena's request for relief filed in 2011 and they did so under the supervision of not only ROGER, but also of WOLFSON.

92.    The litigation between 1995 and 1998 involved investigation conducted by and directed by BELL, HARMON and SCHWARTZ.

93.    Between 1995 and 1998, BELL, HARMON and SCHWARTZ continued to defeat Mr. LaPena's request for relief and they did so by ensuring that Costanza, the informant, was not released, that Costanza remained elusive, and that Weakland "stuck to his story."    This phase of the litigation required investigation, all of which was directed by BELL, HARMON and SCHWARTZ, if not personally conducted by them.

**Others Not Named as Defendants, but Who Bore Responsibility for Mr. LaPena's Damages Suffered Herein are Ralph Lamb, John Moran, John Fingers, Roy Woofter, George Holt, Rex Bell, Jr., Charles Bourne, Robert Wolf, Stephen D. Gregory, Charles Paine and Lawrence Leavitt**

94.    Ralph Lamb was the elected Sheriff of Clark County from 1961 to 1978, and supervising authority of LVMPD during the time of LaPena's initial arrest and conviction. He was responsible for training and supervising defendants LEE, AVANTS and LYONS during the years 1974 through 1978.

95.    John T. Moran was the Undersheriff of the Las Vegas Metropolitan police, and supervising authority of LVMPD from 1973 to 1982 and Sheriff of LVMPD from 1982 to 1990, spanning the time beginning when Mr. LaPena was arrested in 1974 and ending

1    upon his departure from office in 1982 or 1983, while Mr. LaPena was still wrongfully

2    incarcerated.    Moran was responsible for training and supervising LEE, AVANTS,

3    WHITNEY and LYONS during that time period.

4        96.    John McCarthy was the elected Sheriff of Clark County from 1979 to 1983

5    and supervising authority of LVMPD during the time of LaPena's first period of

6    incarceration.    McCarthy had responsibility for training and supervising Defendants

7    WHITNEY, AVANTS and LYONS during this time period.

8        97.    John Fingers was a deputy police officer for the LVMPD, and he participated

9    in the investigation into the Kraus murder/robbery.

10        98.    Roy Woofter was the elected District Attorney for Clark County from 1971 to

11    1974 and served in a supervisory and policy making role during the time of LaPena's initial

12    arrest and investigation.   He has supervisory authority over Defendant HARMON and also

13    over Robert Wolf, Charles Bourne and Charles Paine.

14        99.    George Holt was the elected District Attorney for Clark County from 1974 to

15    1978 and served in s supervisory and policy making role during the time of LaPena's initial

16    conviction.   Holt had supervisory authority over Defendant HARMON and also over Wolf,

17    Bourne, LEE, Stephen Gregory and possibly AVANTS.

18        100.    Rex Bell Jr. was the elected District Attorney for Clark County from 1986 to

19    1994 and served in a supervisory and policy making role during the time of LaPena's second

20    conviction and incarceration and appeal of his post-conviction petition of habeas and

21    resulting in Mr. LaPena's third period of incarceration.  Bell had supervisory authority over

22    Defendant HARMON and also over Wolf, Bourne, SCHWARTZ, AVANTS and LEE.

23        101.    Charles Bourne was, upon information and belief, a CCDA investigator who

24    was, at a minimum, involved in the initial prosecution of Mr. LaPena.  He may have also

25    been involved in other proceedings related to Weakland and Rosalie Maxwell.

26        102.    Robert Wolf was a deputy district attorney with CCDA.   He was present

27    during the "statement" of Weakland.

28

103.    Stephen D. Gregory was a deputy district attorney with CCDA.  He was co-counsel to HARMON at Mr. LaPena's first trial.

104.    Lawrence Leavitt was a deputy district attorney with CCDA.  He was co-counsel to HARMON at Rosalie Maxwell's trial and was, as a result, intimately familiar with Weakland's recantation of his "statement."

105.    Charles Paine was a deputy district attorney with CCDA.  He was co-counsel to HARMON at the preliminary hearing for both Mr. LaPena and Rosalie Maxwell.

**Mr. LaPena's First Trial and Wrongful Conviction**

106.    On March 29, 1974,  defendants LVMPD, CCDA, Ralph Lamb, LYONS, LEE, AVANTS, John T. Moran, Roy A. Woofter and HARMON, knew full well that Weakland's statement that Plaintiff and  his former co-defendant hired him to commit a murder was a lie based upon their personal knowledge their investigative police informant reports, dated January 18, 1974, February 8 and 11th, 1974.

107.    Numerous exculpatory oral statements by the eyewitnesses and confidential informant to available to AVANTS, LEE and WHITNEY refuted Weakland's statement against LaPena and his former co-defendant.

108.    Between May 8, 1974, through June 12, 1974, during LaPena's preliminary hearing, defendants LVMPD, CCDA LEE, AVANTS, LYONS, WHITNEY and HARMON associated and conspired with one another by deliberately, intentionally, unlawfully, maliciously, and corruptly concealing the highly exculpatory C.I. reports authored by defendants WHITNEY on January 18, 1974, LYONS on February 8, 1974, and LEE on February 11, 1974 plus the numerous exculpatory oral statements by the C.I. Costanza in 1974, to defendants WHITNEY, AVANTS AND LEE. These defendants then unlawfully and maliciously lied to plaintiff, his attorneys, Oscar Goodman, Douglas Crosby, Esq. and the magistrate, B. Mahlon Brown, that their open file policy contained everything pertaining to their investigation of the case.

109.    At a hearing in 1974, the testimony of  Roy A. Woofter, AVANTS and LEE was guided and controlled by defendant HARMON and in this manner they conspired with

one another when they concealed the information each of them personally knew about the C.I. Costanza, including his alias name, Joey Starr. They also concealed that they had spoken to Costanza several times about the Krause murder in 1974. This fact was admitted to by HARMON eleven (11) years later before District Court Judge Michael Wendell on January 16, 1985.

110. On or about January 20, 1977, defendants AVANTS and LEE conspired with one another when they intentionally, maliciously and corruptly committed perjury under oath. They did so in conjunction with HARMON and others by intentionally, maliciously, and corruptly "lying" to the trial court, and telling the trial court that they had no idea who the informant was, when they all personally knew that the informant was Joseph Costanza and they had known this since 1974.

111. During Rosalie Maxwell's trial in 1976, Weakland recanted his entire statement of March 29, 1974. HARMON, AVANTS and LEE became very angry. Ms. Maxwell was acquitted of the same charges that Mr. LaPena faced.

112. During LaPena's first trial in March 1977, State witness, Gerald Weakland recanted his prior testimony, as he had done at Maxwell's trial in 1976. At trial Weakland testified his previous statements against LaPena were all lies and that he had done it on his own to protect his family from unrelated charges they were facing. The Defendants worked hard to discredit Weakland recantation and urged that his March 29, 1974, statement was accurate when they knew it was not.

113. On or about May 26, 1977, defendant Clark County District Attorney's Office indicted Weakland on two counts of perjury based upon his recantation of his testimony in both Rosaline's and LaPena's trials because they were angry with Weakland.

114. LaPena was convicted at his first trial and sentenced to life in prison on May 30, 1977.

115. LaPena's convicted was reversed by the Nevada Supreme Court in April 1982 because the state's entire case rested on Weakland and Weakland's recantation caste the conviction into doubt.

**LaPena's Second Trial and Wrongful Conviction**

116.    Mr. LaPena returned to Clark County in May 1982. The prosecutor defendants, including HARMON, opposed release for Mr. LaPena.

117.    Mr. LaPena was not released from custody until late May 1983 because HARMON, MILLER and others in the CCDA strenuously opposed any reduction in bail or release from custody for LaPena.

118.    A preliminary hearing was set and rather than present Weakland as a witness at that hearing, HARMON chose to present the case to a grand jury.

119.    A grand jury indicted Mr. LaPena in October 1982 and HARMON continued to oppose any request for release pending trial that Mr. LaPena made.  It was not until late May of 1983 that Mr. LaPena was able to be released from custody pending his second trial and again, that was over the opposition of HARMON and MILLER.

120.    Mr. LaPena sought information about the informant and HARMON, MILLER and others in the CCDA opposed all of those requests prior to his second trial.

121.    There were multiple proceedings between 1982 and 1988 regarding disclosure of information relating to the informant (Costanza), all of which were opposed by HARMON, MILLER and SCHWARTZ, amongst others.

122.    The state tried to coerce LaPena to pleading guilty to first degree murder, under an Alford plea, in exchange for allowing him to be sentenced to credit for time served. Mr. LaPena refused to plead to a crime he did not commit.  He has always maintained his innocence.

123.    Prior to Mr. LaPena's second trial, AVANTS, LEE, HARMON, SCHWARTZ, MILLER and possibly other defendants named herein orchestrated a resurrection of Weakland's March 29, 1974, statement by agreeing to write favorable letters to the Nevada Parole Board in exchange for the testimony that would benefit them at Mr. LaPena's second trial.

124.    BOB MILLER was a deputy district attorney, an assistant district attorney and/or the elected district attorney and supervisor of all deputy district attorneys and

investigators in that office from January 1983 through late 1986, including, but not limited to HARMON, SCHWARTZ, AVANTS and LEE..

125.    Mr. LaPena was again convicted during his second trial and again sentenced to life in prison.

**The Crimes and Perjury of Gerald Weakland**

126.    During a preliminary hearing, Weakland admitted to the crimes, entered into negotiations with the State, and agreed to testify that LaPena and his girlfriend Rosalie hired him to murder Hilda. In exchange for this testimony, the State allowed Weakland to plead guilty to an amended charge of second-degree murder (carrying a life sentence with a parole eligibility beginning after five years) and agreed to dismiss all other charges against him (some of which were unrelated to the Krause crimes).

127.    In his March 29, 1974, statement, Weakland told authorities that while his accomplice Boutwell burglarized the Krause home, Weakland secretly went upstairs and murdered Hilda by slitting her throat with a single cut. Additionally, Weakland advised the police that he stuck the knife used to slit Hilda's throat into her back.

128.    Weakland never mentioned that he engaged in a struggle with Hilda, nor did he admit to strangling her or making additional stab wounds in her neck prior to or after slitting her throat. Weakland maintained that Boutwell did not know he was going to murder Hilda at all, as Boutwell had only agreed to be a lookout for a robbery.

129.    The evidence at the crime scene has never matched Weakland's testimony or any of his statements.  This would have been obvious to MILLER, BELL, ROGER, WOLFSON, SCHWARTZ, HARMON, WECKERLY, DIGIACOMO, PETERSON, WHITNEY, KELLER and others not named herein.

130.    Weakland maintained that he owed an acquaintance named Frank LaPena money. He also indicated that LaPena solicited him to kill Hilda because a wealthy slot manager at Caesar's Palace named Marvin was dating his girlfriend Rosalie. According to Weakland, LaPena and Rosalie wanted to kill Hilda so that Rosalie could marry Marvin. The two believed they would benefit by ultimately inheriting Marvin's fortune.

131.    Weakland told detectives that LaPena offered to forgive Weakland's debts while paying him a large sum of money if he murdered Hilda. He further stated that ten days before the murder he received $1,000.00 from both Rosalie and LaPena as a down payment for the murder. LaPena told Weakland that he would receive another $10,000.00 after Rosalie married Marvin and detailed the "plan" for robbing the Krauses and murdering Hilda.

132.    Weakland stated Boutwell agreed to assist, believing he was only a lookout for a robbery. Despite the fact that Weakland and Marvin worked together, he advised the police that he had never spoken with, nor had he ever had contact with Marvin prior to the day Hilda was murdered. Based upon Weakland's statement to the police, LaPena and Rosalie were arrested.

133.    At a 1974 preliminary hearing, Weakland testified against LaPena. But during LaPena and Rosalie's separate jury trials, Weakland testified that his prior testimony and statements implicating LaPena and Rosalie in the murder were false. The jury acquitted Rosalie of the charges; however, LaPena was convicted of one count of first-degree murder and one count of robbery with use of a deadly weapon.

134.    After Weakland testified that LaPena was not involved in Hilda's murder at LaPena's first trial, the state indicted, tried and convicted Weakland of two counts of perjury.

135.    On December 8, 1978, Judge Charles Thompson authored a personal letter to the Nevada Department of Parole and Probation, strongly requesting that State witness Weakland not be given favorable consideration for parole because of his lack of cooperation with defendant Clark County District Attorney's Office  stemming from his testimony at LaPena's 1977 trial.

136.    In December of 1978 defendants AVANTS, HARMON, the CCDA and deputy district attorney George Hold authored letters to the Parole Board to intentionally, unlawfully, and maliciously intimidate, threaten, and coerce the state witness, Gerald Weakland from ever again testifying truthfully in any further proceeding, including proceedings against LaPena.

137.    In the Nevada Supreme Court where Weakland had appealed his perjury convictions, the State argued against Weakland, though the Nevada Supreme Court concluded in their opinion that the case of perjury was not overwhelming by any means and his conviction was reversed.  This was while Mr. LaPena's first direct appeal was pending.

138.    On October 29, 1981, defendant CCDA and its deputies reached an agreement with Weakland, whereby Weakland was allowed to enter an Alford Plea to perjury in the two counts and as agreed in the plea bargain, Weakland received probation.

139.    In Mr. LaPena's direct appeal, the Nevada Supreme Court found reversible error and concluded the state improperly withheld "the benefits of a plea bargain or promise of leniency until after a purported accomplice (i.e., Weakland) had testified in a particular manner."

140.    On September 29, 1982, Weakland changed his testimony again before a Clark County Grand Jury. There, Weakland reiterated his negotiated March 29, 1974, statement to and his testimony given during LaPena's preliminary hearing that implicated LaPena. Weakland testified he had reached a new agreement with the State whereby the prosecution team would cease writing negative letters to the State parole board about him. At the conclusion of the presentation, the grand jury returned an indictment against LaPena.

141.    Weakland's change of course was due to letters written to the parole board by numerous others, as part of a new agreement with Weakland.  The agreement was struck between MILLER and Weakland and the letters to the parole board recommending his release were written by MILLER and others as soon as Weakland agreed to testify against LaPena.

142.    Weakland was paroled not long after giving exactly the testimony the defendants wanted because it enabled them to continue to pursue a conviction against LaPena, who they knew was innocent.

### The Statements of Joseph Costanza

143.    On January 16, 1974, defendant and LVMPD detective Michele Whitney was contacted by his "very reliable informant (later identified as Joseph Costanza) that six weeks

24

prior to the murder, he had been approached by Weakland and two other individuals with Weakland, one by the name of "Tom" and the other having long black hair and a bushy black beard, both being very large in size and former professional football players. Based upon the eyewitness/informant's statements to defendants LVMPD, WHITNEY, AVANTS, LEE, HARMON and Roy Woofter, the investigation and prosecution focused on Weakland, Thomas Boutwell and Robert Webb.

144.    Costanza had independent knowledge and told detective WHITNEY the exact location of the Krause's residence.

145.    In February 1974, Costanza advised detectives that Weakland never mentioned LaPena or Rosalie in discussing the crimes.

146.    WHITNEY was privy to this information and did nothing to stop the prosecution of LaPena.

147.    WHITNEY continued to refuse to turn over information related to Costanza, the informant, even though a court ordered the information be disclosed.

148.    Upon being indicted for his second trial on September 29, 1982, LaPena filed a Motion for disclosure of the Identity of Confidential Informant Joey Costanza.

149.    After the District Court denied his motion, LaPena filed for a petition of a writ of mandamus, which the Nevada Supreme Court granted. (Order Granting Writ, August 31, 1985.)

150.    After the Nevada Supreme Court ordered Costanza's name divulged, defendants traveled to New Jersey to encourage Costanza to return to Nevada. He refused. Costanza then telephoned the AVANTS, and advised him that he had no additional information to provide regarding the Krause robbery/murder.    This was according to AVANTS.

151.    Upon obtaining Costanza's address, then defense counsel Gary Gowen, Esq. sent Costanza a letter, but Costanza telephone him advising him that he had no additional information beyond that which he had already given to the detective immediately after the Krause robbery/murder.

152.    Mr. Gowen then attempted to compel Costanza's attendance through utilization of interstate compact, eventually enlisting the assistance of the LVMPD in filing a material witness warrant. According to Mr. Gowen, the CCDA, including HARMON, LEE and possibly AVANTS refused to assist LaPena in his quest to get additional information from Costanza.

153.    As noted previously, MILLER was the district attorney during this time.

154.    Nonetheless, in 1984, LaPena still sought Costanza's attendance in Nevada and filed a motion to depose Costanza. The Nevada Supreme Court reversed the district court's denial of LaPena's motion. (Order Granting Writ, October 22, 1985)

155.    On January 15, 1985, Costanza was arrested in Florida. A defense investigator flew to Florida the following day, but authorities released Costanza from custody at the conclusion of the hearing to compel his attendance in Nevada because proper documents were not provided to the Florida court.

156.    LaPena subsequently filed a motion with the district court for an evidentiary hearing to determine if the State had complied with certain discovery requests, including those seeking further information with regard to Costanza. The district court denied the motion, but the Nevada Supreme Court issued an order that an evidentiary hearing be conducted concerning whether the State had disclosed all of its information regarding Costanza (Order Granting Petition for Writ of Mandamus, August 26, 1988).

157.    Costanza had information that exculpated Mr. LaPena and defendants did everything in their power to conceal Costanza and to prevent LaPena or his defense team access to Costanza.  For example, LEE flew to different states to meet with Costanza and then later claimed he "asked him to return to Nevada," but Costanza refused.

158.    HARMON later sent LEE to Florida to transport Costanza back to Nevada. HARMON was in contact with law enforcement and/or prosecutors in Florida during this time.  Somehow, Costanza was not ordered to return to Nevada by the Florida court, and he refused to come to Nevada voluntarily.

159.    When Mr. LaPena's defense investigator set out for Florida to intercept Costanza, he encountered LVMPD John Finger and LEE, who advised him that Costanza had been released by the Florida court because "the paperwork was not in order."

160.    Costanza was angry and told the defense investigator who tracked him down years later that "law enforcement" always knew where he was.

161.    HARMON had personally contacted Costanza on at least one occasion.

162.    As noted above, MILLER was the District Attorney (and supervisor) from January 1983 through late 1986.   Rex Bell was the District Attorney (and supervisor) from late 1986 through December 1994 and STEWART BELL was the District Attorney (and supervisor) from January 1995 through December 2002.

**Post-Conviction Proceedings in the 1990s**

163.    In approximately 1996, the district court granted Mr. LaPena's post-conviction petition for writ of habeas corpus, following an evidentiary hearing held by Judge Gene Porter.

164.    HARMON and SCHWARTZ litigated against LaPena in these proceedings and their efforts including investigation to rebut LaPena's allegations.  They conducted their own investigation and directed others in the office to investigate.

165.    BELL was the district attorney (and supervisor) during this time.

166.    KELLER was the Sheriff during this time and prior to his election as Sheriff of LVMPD, he held a leadership position with LVMPD.

167.    KELLER was instrumental in ensuring that information relating to the informant, Costanza, was not released.

168.    In these proceedings, HARMON admitted, for the first time, that the state had possession of information about a second assailant, not previously disclosed to anyone.  This information has never been disclosed, despite HARMON asserting that it had.

169.    Mr. LaPena was able to be released from custody again, pending another trial.  However, the state appealed the district court's order.

170.    In 1998, the Nevada Supreme Court reversed the district court's granting of LaPena's petition for post-conviction relief and granting of a new trial and affirmed the district court's denial of LaPena's motion to dismiss.    Mr. LaPena returned himself to custody upon the Nevada Supreme Court's order.

### 2001-2005 Pardon and Parole Proceedings and Revelations

171.    In 2001, Mr. LaPena filed an application with the Nevada Pardons Board to commute his sentence to life with parole so that he would be eligible for parole.

172.    2003, Mr. LaPena appeared before the Pardons Board.    Retired Nevada Supreme Court Justice Gunderson testified before the Pardons Board and he related to the Board, chaired by then Governor Kenny Guinn, that he had always known that Mr. LaPena was innocent because he had learned that from former Judge Addeliar Guy.

173.    Judge Guy, the first African American attorney to practice law in the state of Nevada, had worked as a chief deputy district attorney in the CCDA from 1964 until late June 1975 when he was appointed to the newly created Department 11 in the Eighth Judicial District Court by then Governor Mike O'Callaghan.

174.    Although Addeliar Guy was only in the CCDA until June 1975, he knew that Mr. LaPena was innocent and as a result, so did all of the defendants named herein, as well as the other unnamed persons identified herein as both prosecutors and law enforcement officers.

175.    Mr. LaPena was granted a commutation of his life without parole sentence by the Board in 2003.    This was done over the objection of CCDA, ROGER and PETERSON who vigorously opposed any relief for Mr. LaPena, calling him a dangerous murderer.

176.    PETERSON's testified before the Pardon's Board, which is a non-judicial constitutionally permitted proceeding and is instead a political process.    His testimony, nor any testimony from a prosecutor is never required.

177.    PETERSON's testimony was not well taken by the Pardons Board, and PETERSON sent a letter to the Pardon's Board that it was the "policy" of the CCDA office to oppose relief for persons who had exhausted their legal remedies.

178.    Mr. LaPena was paroled in 2005 and released from custody.  He remained on parole supervision until his full pardon in 2019.

**DNA Petition and Proceedings from 2011 to 2017**

179.    Mr. LaPena filed a post-Conviction petition requesting genetic testing marker analysis of evidence in June 2011 in yet another attempt to establish his innocence and clear his name.

180.    The CCDA, including ROGER, WOLFSON, WECKERLY, DIGIACOMO and others again vigorously opposed any relief for Mr. LaPena.

181.    Those proceedings culminated in an order by then Judge Abbi Silver that was entered in August of 2017.

182.    DNA evidence that was available was tested by both LVMPD and the FBI.

183.    It was revealed that crime scene photos were either missing or never gathered by KELLER who was in charge of processing the crime scene in 1974.  There was a distinct lack of documentation by KELLER and those failures made it difficult to establish the "sequencing" of the murder.

184.    Testimony at the evidentiary proceedings documented the failures of KELLER, LVMPD and others and those failures included preserving evidence in murder cases, which was contrary to LVMPD policy.

185.    Judge Silver found that the DNA evidence tended to support Mr. LaPena's theory of the case, and it definitely established that Weakland's description of the murder in his March 1974 statement was false.  However, she very reluctantly determined that Nevada law as it is structured now (2017) did not give her the authority to find that a new trial was an option available to her as she was constrained by the status of the law as it existed in 2017.

186.    During the course of these proceedings between 2011 and 2017, the DIGIACOMO, WECKERLY and WOLFSON conducted and directed additional

investigation throughout these proceedings in order to defeat LaPena's claims for relief. They did so knowing that they were protecting the CCDA, HARMON and others and that LaPena was actually innocent.

187.    WECKERLY and DIGIACOMO interviewed witnesses and directed others to interview witnesses during the DNA petition proceedings.

**Pardon Proceedings in 2019 and Compensation Claim Pursuant to NRS Chapter 41**

188.    On November 6, 2019, LaPena received a general pardon for the offenses related to Krause's murder based on his " actual innocence" by a unanimous vote of the Board of Pardons.

189.    Prior to the general pardon granted Mr. LaPena in November 2019, Mr. LaPena was on lifetime parole supervision, subject to reporting requirements and certain restrictions which limited his freedom, certain civil rights and more importantly, he lived in our society as a "convicted murdered" when in fact he was not a murderer.

190.    In March 2020, Mr. LaPena filed his Petition for a Certificate of Actual Innocence and his Claim for Compensation pursuant to NRS 41.950, et seq.

191.    The State of Nevada resolved the claims with Mr. LaPena via a Joint Motion for Settlement and Request for Orders Related Thereto. That Joint Motion was filed in June 2021.

192.    The district court approved the Motion on June 30, 2021.  Mr. LaPena was granted his Certificate of Innocence on that date.

193.    In August 2021, the State of Nevada compensated Mr. LaPena a total of just under $2,000,000 for his time spent wrongfully incarcerated, for his time spent on parole and for myriad other related relief, all of which is permitted by statute.

194.    Mr. LaPena was not compensated for any time that he spent awaiting trial, or any time that he spent post-remand from the Nevada Supreme Court in 1982 and 1983 because those damages are not permitted by statute.

195.   Mr. LaPena was not compensated entirely for his lost income, lost years in the prime of his life, lost public benefits and wage contributions or for his emotional distress, pain and suffering that resulted from battling his case for a period of 45 years.

196.   Any recovery from additional sources must be repaid to the State of Nevada to the extent that those recoveries are for the same injuries for which the state compensated him pursuant to NRS Chapter 41.

### Mr. LaPena's Injuries

197.   Mr. LaPena was wrongfully convicted of two felonies: Robbery with use of a Deadly Weapon (NRS 200.380, 163.165); and Murder with Use of a Deadly Weapon (NRS 200.010, 200.030, 193.165) by the State of Nevada, and sentenced to life in prison.

198.   The unlawful, intentional, willful, deliberately indifferent, reckless, or bad-faith acts and omissions of the County, Law Enforcement, and District Attorney defendants caused Mr. LaPena to be falsely arrested and imprisoned, unfairly tried, wrongfully convicted, and forced to serve 7,013 days imprisoned for a crime he did not commit, over three distinct periods: (1) April 9, 1977 to May 20, 1982; (2) from June 29, 1989 to June 6, 1997; and (30 from December 15 1998 to February 8,2005.

199.   From April 23, 1974, to June 30, 2021, Mr. LaPena labored under burden of (a) a pending trial, (b) a pending retrial, (c) parole, (d) efforts to clear his name, and (e) a pardon, but still a conviction for murder.

200.   Mr. LaPena lost employment during the times he was incarcerated.

201.   Mr. LaPena lost employment opportunities between April 1974 and November 2019 when he was  not incarcerated simply due to the fact that he either (a) had a murder trial pending, (b) was at risk of having to return to the Department of Corrections at any time, or (c) was a paroled felon with a criminal conviction for murder.

202.   Mr. LaPena lost property, both real property and personal property that was taken from him by others who saw his conviction and incarceration as a grand opportunity to steal and divert his assets for their own use.

203.    Mr. LaPena lost relationships with people he cared about between 1974 and 2019.

204.    Mr. LaPena lost pets he loved dearly due to his incarceration.

205.    Mr. LaPena lost the opportunity to have a family of his own.

206.    Mr. LaPena was deprived of his dignity in unimaginable ways.

207.    As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, or deliberately indifferent acts and omissions, Mr. LaPena sustained injuries and damages that continue to date and will continue into the future, including: loss of freedom for decades, pain and suffering, severe mental anguish, emotional distress, loss of family relationships, severe psychological damage, loss of property, legal expenses, loss of income, humiliation, indignities and embarrassment, degradation, permanent loss of natural psychological development and restrictions on all forms of personal freedom and stripped of all the various pleasures of basic human experience, from the simplest to the most important. Mr. LaPena missed out on the ability to share holidays, births, funeral and other life events with loved ones, and the fundamental freedom to live his life as an autonomous human being.

208.    Mr. LaPena continues to suffer nightmares and from depression, despite his newly granted freedom and certificate of innocence.

209.    Mr. LaPena's experience of being wrongfully accused and  convicted for over 45 years has impacted his mental health and to some extent his physical health.

210.    Attached hereto are Exhibits documenting the history of this case in support of many of the allegations contained herein.   An index of the Exhibits appears at the end of this complaint and those Exhibits are incorporated herein by this reference.


## FEDERAL CLAIMS

### Count 1: 42 U.S.C. § 1983 – Fifth and Fourteenth Amendments
### Due Process (Against all individually named defendants)

211.    Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

212.    In the manner described more fully above, the Law Enforcement and District Attorney Defendants, acting as investigators, individually, jointly, and in conspiracy with one another, deprived Plaintiff of his constitutional right to due process and a fair trial.

213.    In the manner described more fully above, the Law Enforcement and District Attorney Defendants fabricated and solicited false evidence, as well as withheld exculpatory evidence from Plaintiff thereby misleading and misdirecting the criminal prosecution of Plaintiff. The Law Enforcement and District Attorney Defendants continued their investigation of the Plaintiff despite the fact that they knew, or were deliberately indifferent to Plaintiff's innocence, and the results of the investigation were used to convict the Plaintiff. Moreover, Defendants use investigative techniques that were so coercive and abusive that they knew or were deliberately indifferent to the fact that those techniques would yield false information that was used to convict Plaintiff.

214.    The Law Enforcement and District Attorney Defendants' misconduct directly resulted in the unjust criminal conviction of Plaintiff, thereby denying his constitutional right to due process and a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued, and he would have not been convicted.

215.    The above-described misconduct took place under the direct supervision of one or more of the Law Enforcement and District Attorney Defendants. The constitutional violations alleged herein occurred at these Defendants' direction, and but for the actions of these Defendants the misconduct alleged in this Complaint could not have occurred.

216.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others.

217.    The Law Enforcement and District Attorney Defendants were acting under color of law and within the scope of their employment when they took these actions.

218.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and

emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

219.    The Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of the Defendants LVMPD and CCDA in the manner more fully described above.

220.    The conduct of the Defendants shocks the conscience, is oppressive and/or malicious and as such, punitive damages should be awarded.

221.    Mr. LaPena is entitled to prejudgment interest on all damages awarded herein.

222.    Mr. LaPena was forced to retain the services of counsel and as such he is entitled to recovery of attorney's fees and costs incurred herein pursuant to statute or other authority that authorizes the same.

**Count II: 42 U.S.C. § 1983 – Fourth and Fourteenth Amendments**
**Federal Malicious Prosecution, Deprivation of Liberty,**
**and Detention without Probable Cause (Against all individually named Defendants)**

223.    Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

224.    In the manner described more fully above, the Law Enforcement and District Attorney Defendant's acting as investigators, individually, jointly, and in conspiracy with each other, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent.

225.    Plaintiff's criminal proceedings were terminated in her favor, in a manner indicative of innocence.

226.    The Law Enforcement and District Attorney Defendants caused Plaintiff to be unreasonably seized without probable cause and deprived of his liberty, in violation of Plaintiff's rights secured by the Fourth and Fourteenth Amendments.

227.    The Law Enforcement and District Attorney Defendants deprived Plaintiff of fair state criminal proceedings, including the opportunity to successfully defend the charges

against him during those proceedings, resulting in a deprivation of his liberty without due process.

228.    In addition, the Law Enforcement and District Attorney Defendants subjected Plaintiff to arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a crime of which he was totally innocent, through Defendants' misconduct. Defendants' action contravened fundamental canons of decency and fairness and violated Plaintiff's rights under the Fourteenth Amendment.

229.    The above-described misconduct took place under the direct supervision of one or more of the Law Enforcement Defendants named herein. The constitutional violations alleged herein occurred at these Defendants' direction, and these Defendants were deliberately indifferent thereto. Absent knowing participation by these Defendants, the misconduct alleged in this Complaint could not have occurred.

230.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others.

231.    The Law Enforcement and District Attorney Defendants were acting under color of law and within the scope of their employment when they took these actions.

232.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

233.    The Defendants' misconduct described in this count was undertaken pursuant to the policies practices, and customs of the Defendant CCDA and LVMPD, in the manner more fully described above.

234.    The conduct of the Defendants shocks the conscience, is oppressive and/or malicious and as such, punitive damages should be awarded.

235.    Mr. LaPena is entitled to prejudgment interest on all damages awarded herein.

236.    Mr. LaPena was forced to retain the services of counsel and as such he is entitled to recovery of attorney's fees and costs incurred herein pursuant to statute or other authority that authorizes the same.

**Count III: 42 U.S.C. § 1983 – Failure to Intervene (Against the supervisory Defendants)**

237.    Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

238.    In the manner described more fully above, during the constitutional violations described herein, Defendants (Supervisors) KELLER, MILLER, HARMON, BELL, ROGER and WOLFSON knowingly allowed what they knew or should have known to be false charges to be prepared for prosecution without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

239.    Further, the supervisory defendants KELLER, MILLER, HARMON, BELL, ROGER and WOLFSON supervised their respective agencies while proceedings spanning 40 years continued to deprive Mr. LaPena of his constitutional rights under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

240.    This misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the right of others.

241.    Defendants KELLER, MILLER, HARMON, BELL, ROGER and WOLFSON were acting under color of law and within the scope of their employment when they took these actions.

242.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

243.    The conduct of the Defendants shocks the conscience, is oppressive and/or malicious and as such, punitive damages should be awarded.

244.    Mr. LaPena is entitled to prejudgment interest on all damages awarded herein.

245.    Mr. LaPena was forced to retain the services of counsel and as such he is entitled to recovery of attorney's fees and costs incurred herein pursuant to statute or other authority that authorizes the same.

**Count IV: 42 U.S.C. §1983 – Conspiracy to Deprive Constitutional Rights (Against all Individually Named Defendants)**

246.    Each preceding paragraph of this Complain is incorporated as if restated fully herein.

247.    Prior to Plaintiff's conviction, all of the Law Enforcement and District Attorney Defendants, acting in concern with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and thereby to deprive him of his constitutional rights, all as described in this Complaint. All of the Law Enforcement and District Attorney Defendants agreed to investigate and cause the prosecution of Mr. LaPena for a crime he did not commit and took overt actions in conformity with that agreement.

248.    As further described above, the Defendants agreed to fabricate evidence against Mr. LaPena in the form of false police reports purportedly detailing statements that Mr. Weakland made about the Hilda Krause Murder which they knew were false or misleading in their incrimination of Mr. LaPena.

249.    In doing so, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability by depriving Plaintiff of these rights.

250.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity, as described more fully above.

251.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others.

252.    The Law Enforcement and District Attorney Defendants were acting under color of law and within the scope of their employment when they took these actions.

253.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

254.    The conduct of the Defendants shocks the conscience, is oppressive and/or malicious and as such, punitive damages should be awarded.

255.    Mr. LaPena is entitled to prejudgment interest on all damages awarded herein.

256.    Mr. LaPena was forced to retain the services of counsel and as such he is entitled to recovery of attorney's fees and costs incurred herein pursuant to statute or other authority that authorizes the same.

**Count V 42 U.S.C. §1983 *Monell* Claim**
***Monell* Unconstitutional Policy, Custom, or Pattern and**
**Practice of Promoting, Facilitating, or Condoning Improper, Illegal and**
**Unconstitutional Investigative techniques and**
**Failure to Supervise Discipline and Train**
***(*Against the Las Vegas Metropolitan Police Department and Clark County)**

257.    Each paragraph of this complaint is incorporated as if restated fully herein.

258.    CCDA, by its own admission, is a subdivision of Clark County and Clark County is the proper entity to sue.

259.    Prior to and at the time of the unlawful investigation, prosecution and conviction of LaPena, the LVMPD and CCDA, by and through its final policy makers, maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal and unconstitutional investigative techniques in serious felony investigations, including but not limited to the following: (a) the reliance on witness statements that law enforcement knew or should have known were false; (b) the use of suggestive techniques, direct suggestion, or coercive techniques in interviews and interrogations to obtain false statements; (c) the fabrication of inculpatory evidence; (d) the

suppression of exculpatory and impeachment evidence; (e) the intentional failure to conduct adequate investigations of crimes; and (f) engaging in the affirmative concealment and cover up of this type of misconduct.

260.    Prior to and at the time of the unlawful investigation, prosecution, and conviction of LaPena, the LVMPD and CCDA, by and through its final policymakers, maintained a policy, custom or pattern and practice of failing to adequately supervise, discipline and train LVMPD detectives and officers and District Attorney's and deputies in connection with fundamental investigative tasks implicating the constitutional rights of witnesses and suspects including but not limited to using police informants, conducting custodial interrogations and witness interviews, documenting and disclosing exculpatory and impeachment evidence to defendant's counsel, and the affirmative ongoing duty to come forward with exonerating evidence.

261.    The LVMPD and CCDA's policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques in serious felony investigations, and its policy, custom, or pattern and practice of failing to adequately supervise, discipline and train LVMPD detectives and officers and District Attorney's and deputies was reflected by the multiple acts of misconduct and illegality committed by multiple LVMPD detectives and supervisors and District Attorney office members in relation to multiple witnesses in the LaPena investigation, as described above.

262.    Such unconstitutional municipal customs, practices, or policies were the moving force behind the false evidence used against LaPena, causing his arrest, prosecution, and over 23 years of incarceration, 15 years on parole as well as all the other grievous injuries and damages set forth above.

263.    When Mr. LaPena was charged in 1974, there was a strong interest by both LVMPD and Clark County in investigating what it coined "mob associates and figures." The informant, Costanza, was largely a "mob informant," who was protected from prosecution by virtue of his cooperation.    The desire to protect Costanza, because he had valuable

information overrode the requirement to provide information that was exculpatory to Mr. LaPena and his defense counsel. This was established later in the litigation, but not in time for Mr. LaPena to have a fair trial, or two. This was the policy and practice of LVMPD and Clark County at that time.

264. The conduct of the Defendants shocks the conscience, is oppressive and/or malicious and as such, punitive damages should be awarded.

265. Mr. LaPena is entitled to prejudgment interest on all damages awarded herein.

266. Mr. LaPena was forced to retain the services of counsel and as such he is entitled to recovery of attorney's fees and costs incurred herein pursuant to statute or other authority that authorizes the same.

## STATE OF NEVADA CLAIMS

### Count VI: Nevada State Law – Malicious Prosecution
### (Against all Defendants)

267. Each paragraph of this complaint is incorporated as if restated fully herein.

268. In the manner described more fully above, the Law Enforcement and District Attorney Defendants, acting as investigators, individually jointly and in conspiracy with each other, and maliciously, instituted or continued the prosecution of Plaintiff without probable cause. As a consequence of the criminal prosecution, Plaintiff was unlawfully seized, deprived of liberty, and wrongfully convicted of a crime of which he is innocent.

269. Plaintiff's criminal prosecution was terminated in his favor in a manner indicative of innocence.

270. The Law Enforcement and District Attorney Defendants were acting under color of law and within the scope of their employment when they took these actions.

271. Through the doctrine of *respondeat superior,* Defendants CCPD, LVMPD and CLARK COUNTY are liable as principal for all state law torts committed by their employees or agents, including the misconduct described in this Count.

272.    As a direct and proximate result of the Defendants' actions, Plaintiff's rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

273.    The conduct of the Defendants shocks the conscience, is oppressive and/or malicious and as such, punitive damages should be awarded.

274.    Mr. LaPena is entitled to prejudgment interest on all damages awarded herein.

275.    Mr. LaPena was forced to retain the services of counsel and as such he is entitled to recovery of attorney's fees and costs incurred herein pursuant to statute or other authority that authorizes the same.

**Count VII: Nevada State Law – Abuse of Process**
**(Against all Defendants)**

276.    Each paragraph of this complaint is incorporated as if restated fully herein.

277.    The Law Enforcement and District Attorney Defendants took the actions described more fully above, including instituting and continuing a criminal proceeding against the Plaintiff, with an ulterior purpose other than resolving a legal dispute or resolving the guilt or innocence of Plaintiff in the murder of Hilda Krause. The Defendants also committed willful acts in the use of the legal process which were not proper in the regular conduct of Plaintiff's criminal proceeding.

278.    The Law Enforcement Defendants were acting under color of law and within the scope of their employment when they took these actions.

279.    Through the doctrine of *respondeat superior,* Defendants LVMPD and CLARK COUNTY are liable as principal for all state law torts committed by their employees or agents, including the misconduct described in this Count.

280.    As a direct and proximate result of the Defendants' actions, Plaintiff's rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

281.    The conduct of the Defendants shocks the conscience, is oppressive and/or malicious and as such, punitive damages should be awarded.

282.    Mr. LaPena is entitled to prejudgment interest on all damages awarded herein.

283.    Mr. LaPena was forced to retain the services of counsel and as such he is entitled to recovery of attorney's fees and costs incurred herein pursuant to statute or other authority that authorizes the same.

**Count VIII: Nevada State Law – Intentional Infliction of Emotional Distress
(Against all Defendants)**

284.    Each paragraph of this Complaint is incorporated as if restated fully herein.

285.    In the manner described more fully above, the Law Enforcement and District Attorney Defendants, acting as investigators, individually, jointly, and in conspiracy with each other, engaged in extreme and outrageous conduct with the intention of or reckless disregard for, causing Plaintiff emotional distress, and Plaintiff suffered severe or extreme emotional distress. The Defendants' misconduct was the actual and proximate cause of Plaintiff's severe or extreme emotional distress.

286.    The Law Enforcement and District Attorney Defendants were acting under color of law and within the scope of their employment when they took these actions.

287.    Through the doctrine of *respondeat superior,* Defendants LVMPD and CLARK COUNTY are liable as principal for all state law torts committed by their employees or agents, including the misconduct described in this Count.

288.    As a direct and proximate result of the Defendants' actions, Plaintiff's rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

289.    The conduct of the Defendants shocks the conscience, is oppressive and/or malicious and as such, punitive damages should be awarded.

290.    Mr. LaPena is entitled to prejudgment interest on all damages awarded herein.

291.    Mr. LaPena was forced to retain the services of counsel and as such he is entitled to recovery of attorney's fees and costs incurred herein pursuant to statute or other authority that authorizes the same.

## Count IX: Nevada State Law – Civil Conspiracy
### (Against all Defendants)

292.    Each paragraph of this Complaint is incorporated as if restated fully herein.

293.    In the manner described more fully above, the Law Enforcement and District Attorney Defendants, acting in concert with other known and unknown co-conspirators conspired and intended by concerted action to accomplish an unlawful objective for the purpose of harming Plaintiff, which resulted in damage to Plaintiff. All of the Law Enforcement Defendants and all Prosecution Defendants agreed to investigate and prosecute Mr. LaPena for a crime he did not commit and took overt actions in conformity with that agreement.

294.    In furtherance of the conspiracy, the Law Enforcement and District Attorney Defendants committed overt acts and were otherwise willful participants in joint activity, as described more fully above.

295.    As further described above, the Defendants agreed to fabricate evidence against Mr. LaPena in the form of false police reports purportedly detailing statements that Weakland had made about Mr. LaPena's involvement in the Hilda Krause murder which they knew were false and misleading.

296.    For decades, law enforcement and prosecutor defendants and their respective agencies carried out what is tantamount to a vendetta against Mr. LaPena to ensure that he continued to suffer from their fabricated and false theory of liability.

297.    The Law Enforcement and District Attorney Defendants were acting under color of law and within the scope of their employment when they took these actions.

298.    Through the doctrine of *respondeat superior,* Defendants LVMPD and CLARK COUNTY are liable as principal for all state law torts committed by their employees or agents, including the misconduct described in this Count.

299.    As a direct and proximate result of the Defendants' actions, Plaintiff's rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

300.    The conduct of the Defendants shocks the conscience, is oppressive and/or malicious and as such, punitive damages should be awarded.

301.    Mr. LaPena is entitled to prejudgment interest on all damages awarded herein.

302.    Mr. LaPena was forced to retain the services of counsel and as such he is entitled to recovery of attorney's fees and costs incurred herein pursuant to statute or other authority that authorizes the same.

## Count X: Nevada State Law – *Respondeat Superior*
### (Against Clark County, LVMPD)

303.    Each paragraph of this Complaint is incorporated as if restated fully herein.

304.    While committing the acts alleged in the preceding paragraphs, the individually named Defendants were employees of the Defendants LVMPD and CLARK COUNTY, acting at all relevant times within the scope of their employment.

305.    Defendant CLARK COUNTY is liable as principal for all state law torts committed by their agents.

306.    The conduct of the Defendants shocks the conscience, is oppressive and/or malicious and as such, punitive damages should be awarded.

307.    Mr. LaPena is entitled to prejudgment interest on all damages awarded herein.

308.    Mr. LaPena was forced to retain the services of counsel and as such he is entitled to recovery of attorney's fees and costs incurred herein pursuant to statute or other authority that authorizes the same.

## Count XI:  Nevada State Law – Negligent Infliction of Emotional Distress
### (Against all Defendants)

309.    Each paragraph of this Complaint is incorporated as if restated fully herein.

310.    The individual named defendants herein, as well as the entity and municipal defendants owed a standard duty of care to Mr. LaPena to ensure that his constitutional rights were not violated.

311.    Defendants breached that duty of care.

312.    Mr. LaPena suffered emotional damages as a result of that breach which was proximately caused by the conduct of the individually named defendants.

313.    While committing the acts alleged in the preceding paragraphs, the individually named Defendants were employees of the Defendants LVMPD and CLARK COUNTY, acting at all relevant times within the scope of their employment.

314.    Defendant CLARK COUNTY is liable as principal for all state law torts committed by their agents, including employees of CCDA and LVMPD.

315.    Mr. LaPena is entitled to prejudgment interest on all damages awarded herein.

316.    Mr. LaPena was forced to retain the services of counsel and as such he is entitled to recovery of attorney's fees and costs incurred herein pursuant to statute or other authority that authorizes the same.

## Count XII: Nevada State Law – Indemnification

317.    Each paragraph of this Complaint is incorporated as if restated fully herein.

318.    Nevada law provides that Defendants LVMPD and/or CLARK COUNTY is directed to pay any tort judgment for compensatory damages for which their employees are liable within the scope of their employment activities.

319.    The individually named Defendants herein were employees of the LVMPD and CLARK COUNTY and acted within the scope of his employment at all times relevant in committing the actions and omissions described herein.

320.    Mr. LaPena is entitled to prejudgment interest on all damages awarded herein.

321.    Mr. LaPena was forced to retain the services of counsel and as such he is entitled to recovery of attorney's fees and costs incurred herein pursuant to statute or other authority that authorizes the same.

**Count XIII:  Insurance Claims Against Policies in Effect at the time and held by Any Deceased Defendant**

322.    Each paragraph of this Complaint is incorporated as if restated fully herein.

323.    To the extent that any Defendant named herein is deceased, and to the extent that any deceased Defendant had available insurance coverage at the time of the events described herein, Plaintiff hereby provides notice to the said Estates that he will seek the recovery sought herein against those policies consistent with Counts I through XII set forth above.

## JURY DEMAND

Plaintiff demands a jury trial for the claims set forth herein.

WHEREFORE, Plaintiff, FRANK LAPENA, respectfully requests that this Court enter a judgment in his favor and against all Defendants named herein awarding:

1.  Compensatory damages,

2.  Economic damages,

3.  Punitive damages,

4.  Attorney's fees,

5.  Costs incurred herein, and

6.  Any other relief this Court deems just and proper.

DATED this 5th day of January 2022.

Respectfully Submitted By:

/s/ Lisa A. Rasmussen
LISA A. RASMUSSEN, ESQ.
Nevada Bar No. 007491
RICHARD BRYANT, ESQ.
Nevada Bar No. 15511
615 S. 6th St.
Las Vegas, NV 89101
(702) 222-0007
Attorneys for Plaintiff, Frank LaPena

46

# INDEX OF EXHIBITS

**1.** ............................................................................................................................................/
        ARTICLE: CONTRACT KILL RULED OUT IN TOWNHOUSE STABBING
        Dated 01/15/1974

**2.**      STATE'S EXHIBIT 3: STATEMENT OF GERALD WEAKLAND
        Dated 03/29/1974

**3.**      TRANSCRIPT OF PRELIMINARY HEARING VOL. I
        Dated 5/8/1974

**4.** TRANSCRIPT OF PRELIMINARY HEARING VOL. II
        Dated 5/10/1974

**5.**      TRANSCRIPT OF PRELIMINARY HEARING VOL. III
        Dated 5/14/1974

**6.** TRANSCRIPT OF PRELIMINARY HEARING VOL. IV
        Dated 5/15/1974

**7.** TRANSCRIPT OF PRELIMINARY HEARING VOL. V
        Dated 5/16/1974

**8.**      TRANSCRIPT OF PRELIMINARY HEARING VOL. VI
        Dated 5/17/1974

**9.** TRANSCRIPT OF PRELIMINARY HEARING VOL. VI
        (CONTINUED)
        Dated 5/17/1974

**10.**     TRANSCRIPT OF PRELIMINARY HEARING VOL. VII
        Dated 5/22/1974

**11.**     TRANSCRIPT OF PRELIMINARY HEARING VOL. VIII
        Dated 6/25/1974

**12.**     TRANSCRIPT OF PRELIMINARY HEARING VOL. IX
        Dated 6/26/1974

**13.**     TRANSCRIPT OF PRELIMINARY HEARING VOL. X
        Dated 9/4/1974

**14.**     ORDER
        Dated 10/1/1974

**15.**     STATE'S EXHIBIT 4: 1995 EVIDENTIARY HEARING: PLEA AGREEMENT OF
        GERALD WEAKLAND, CASE NO. 27870
        Dated 11/7/1974

**16.**     OPINION – NEVADA SUPREME COURT CASE NO. 8063
        Dated 1/2/1976

**17.**     TRANSCRIPT OF DECISION ON DEFENDANT'S MOTION AND ORDER
        REQUIRING DISCLOSURE OF NAMES AND WHEREABOUTS OF

47

INFORMANT

Dated 06/30/1976

**18.**    TRANSCRIPT OF JURY TRIAL VOL. I

RE: ROSALIE MAXWELL

Dated 7/20/1976

**19.**    TRANSCRIPT OF JURY TRIAL VOL. II

RE: ROSALIE MAXWELL

Dated 7/21/1976

**20.**    TRANSCRIPT OF JURY TRIAL VOL. III

RE: ROSALIE MAXWELL

Dated 7/23/1976

**21.**    TRANSCRIPT OF JURY TRIAL VOL. IV

RE: ROSALIE MAXWELL

Dated 7/26/1976

**22.**    TRANSCRIPT OF JURY TRIAL VOL. V

RE: ROSALIE MAXWELL

Dated 7/27/1976

**23.**    TRANSCRIPT OF JURY TRIAL VOL. VI

RE: ROSALIE MAXWELL

Dated 7/28/1976

**24.**    TRANSCRIPT OF JURY TRIAL VOL. VII

RE: ROSALIE MAXWELL

Dated 7/29/1976

**25.**    TRANSCRIPT OF JURY TRIAL VOL. VIII

RE: ROSALIE MAXWELL

Dated 7/30/1976

**26.**    TRANSCRIPT OF JURY TRIAL VOL. IX

RE: ROSALIE MAXWELL

Dated 8/2/1976

**27.**    TRANSCRIPT OF JURY TRIAL VOL. IX (CONTINUED)

RE: ROSALIE MAXWELL

Dated 8/2/1976

**28.**    TRANSCRIPT OF JURY TRIAL VOL. X

RE: ROSALIE MAXWELL

Dated 8/3/1976

**29.**    TRANSCRIPT OF JURY TRIAL VOL. XI

RE: ROSALIE MAXWELL

Dated 8/4/1976

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**30.**    TRANSCRIPT OF JURY TRIAL VOL. XII
RE: ROSALIE MAXWELL
Dated 8/5/1976

**31.**    TRANSCRIPT OF JURY TRIAL VOL. XIII
RE: ROSALIE MAXWELL
Dated 8/10/1976

**32.**    TRANSCRIPT OF JURY TRIAL VOL. XIV
RE: ROSALIE MAXWELL
Dated 8/11/1976

**33.**    TRANSCRIPT OF JURY TRIAL VOL. XV
RE: ROSALIE MAXWELL
Dated 8/12/1976

**34.**    TRANSCRIPT OF JURY TRIAL VOL. XVI
RE: ROSALIE MAXWELL
Dated 8/16/1976

**35.**    TRANSCRIPT OF JURY TRIAL VOL. XVII
RE: ROSALIE MAXWELL
Dated 8/17/1976

**36.**    TRANSCRIPT OF JURY TRIAL VOL. XVIII
RE: ROSALIE MAXWELL
Dated 8/18/1976

**37.**    TRANSCRIPT OF JURY TRIAL VOL. XIX
RE: ROSALIE MAXWELL
Dated 8/20/1976

**38.**    TRANSCRIPT OF HEARING RE: DEFENDANT'S MOTION FOR
AN ORDER REQUIRING DISCLOSURE OF NAME AND
WHEREABOUTS OF INFORMER
Dated 01/28/1977

**39.**    TRANSCRIPT OF JURY TRIAL VOL. I
Dated 3/21/1977

**40.**    TRANSCRIPT OF JURY TRIAL VOL. II
Dated 3/22/1977

**41.**    TRANSCRIPT OF JURY TRIAL VOL. III
Dated 3/23/1977

**42.**    TRANSCRIPT OF JURY TRIAL VOL. IV
Dated 3/25/1977

**43.**    TRANSCRIPT OF JURY TRIAL VOL. V
Dated 3/28/1977

**44.**   TRANSCRIPT OF JURY TRIAL VOL. VI
Dated 3/29/1977

**45.**   TRANSCRIPT OF JURY TRIAL VOL. VII
Dated 3/30/1977

**46.**   TRANSCRIPT OF JURY TRIAL VOL. VIII
Dated 3/31/1977

**47.**   TRANSCRIPT OF JURY TRIAL VOL. IX
Dated 4/4/1977

**48.**   TRANSCRIPT OF JURY TRIAL VOL. X
Dated 4/5/1977

**49.**   TRANSCRIPT OF JURY TRIAL VOL. XI
Dated 4/6/1977

**50.**   TRANSCRIPT OF JURY TRIAL VOL. XII
Dated 4/7/1977

**51.**   TRANSCRIPT OF JURY TRIAL VOL. XIII
Dated 4/8/1977

**52.**   TRANSCRIPT OF JURY TRIAL VOL. XIV
Dated 4/9/1977

**53.**   VERDICT
Dated 4/9/1977

**54.**   VERDICT
Dated 4/9/1977

**55.**   TRANSCRIPT OF ENTRY OF JUDGMENT AND IMPOSITION OF SENTENCE
Dated 5/11/1977

**56.**   JUDGMENT OF CONVICTION
Dated 5/29/1977

**57.**   TRANSCRIPT OF JURY TRIAL VOL. I
Dated 7/27/1977

**58.**   TRANSCRIPT OF JURY TRIAL VOL. II
Dated 7/29/1977

**59.**   TRANSCRIPT OF JURY TRIAL VOL. III
Dated 8/1/1977

**60.**   TRANSCRIPT OF JURY TRIAL VOL. IV
Dated 1/27/1978

**61.**   TRANSCRIPT OF JURY TRIAL VOL. V
Dated 2/1/1978

**62.**   DEFENDANT'S EXHIBIT Q4: 1983 HEARING: LETTER FROM JUDGE

THOMPSON TO PAROLE BOARD RE: WEAKLAND
Dated 12/8/1978

63..................................................................................................................... /

DEFENDANT'S EXHIBIT Q5: 1983 HEARING: LETTER FROM LT. AVANTS
TO PAROLE BOARD RE: WEAKLAND
Dated 12/14/1978

64.    DEFENDANT'S EXHIBIT Q3: 1983 HEARING: LETTER FROM MELVYN
HARMON TO PAROLE BOARD
Dated 12/29/1978

65.    ARTICLE: BRIBERY PROBE TRIPS LV COP
Dated 7/10/1981

66.    ARTICLE: LONGTIME SPILOTRO ASSOCIATE ARRESTED
ON COCAINE CHARGES
Dated 7/10/1981

67.    LETTER FROM BEECHER AVANTS DA TO
BRYN ARMSTRONG
Dated 12/16/1981

68.    LETTER FROM DONALD WADSWORTH TO PAROLE BOARD
RE: GERALD WEAKLAND
Dated 1/14/1982

69.    MOTION FOR ORDER REQUIRING DISCLOSURE OF NAME AND
WHEREABOUTS OF INFORMER
Dated 9/17/1982

70.    POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ORDER
REQUIRING DISCLOSURE OF NAME AND WHEREABOUTS OF INFORMER
Dated 9/17/1982

71.    LETTER FROM ROBERT MILLER TO WEAKLAND
Dated 9/28/1982

72.    LETTER FROM ROBERT MILLER TO BOARD OF PAROLE
Dated 9/28/1982

73.    TRANSCRIPT OF GRAND JURY PROCEEDINGS
Dated 9/29/1982

74.    INDICTMENT
Dated 9/29/1982

75.    ORDER APPROVING PROPERTY APPEARANCE BOND AND RELEASE OF
DEFENDANT FROM CUSTODY
Dated 5/25/1983

76.    DISTRICT ATTORNEY'S OFFICE:

REPORT OF INVESTIGATION

Dated 9/21/1983

77.   STATE'S EXHIBIT 11: 1995 EVIDENTIARY HEARING:

REPORT OF INVESTIGATION

Dated 10/17/1983

78.   TRANSCRIPT OF PROCEEDINGS

Dated 12/8/1983

79.   TRANSCRIPT OF HEARING RE: WRIT OF HABEAS

CORPUS

Dated 12/8/1983

80.   MOTION TO TAKE DEPOSITION OF FORMER

CONFIDENTIAL INFORMANT

Dated 6/20/1984

81.   MOTION FOR PRODUCTION OF POLICE INFORMANT FILEAND

ALL INFORMATION AND POLICE REPORTS REGARDING

INFORMANT'S PRIOR POLICE

INVOLVEMENT

Dated 12/12/1984

82.   CERTIFICATE AND ORDER FOR SUMMONS OF OUT OF

STATE WITNESSES

Dated 1/2/1985

83.   SUMMONS OF MATERIAL WITNESS BENCH WARRANT FOR MATERIAL

WITNESS AND BAIL

Dated 1/2/1985

84.   EX PARTE MOTION FOR ISSUANCE OF SUMMONS

AND BENCH WARRANT FOR MATERIAL WITNESS

Dated 1/2/1985

85.   MOTION FOR ORDER REQUIRING PRESENCE OF

OUT OF STATE WITNESSES

Dated 1/2/1985

86.   PETITION FOR AN ORIGINAL WRIT OF HABEAS CORPUS

OR ALTERNATIVELY, PETITION FOR WRIT OF MANDAMUS

Dated 1/9/1985

87.   STATE'S EXHIBIT 13: 1995 EVIDENTIARY HEARING:INTEROFFICE MEMO

TO BEECHER AVANTS AND

CHUCK LEE FROM MEL HARMON

Dated 1/15/1985

88.   TRANSCRIPT OF PROCEEDINGS

Dated 1/16/1985

**89.** AFFIDAVIT OF SY RYAN
Dated 1/17/1985

**90.** DEFENDANT'S EXHIBIT B: 1988 EVIDENTIARY HEARING:
LVMPD INTELLIGENCE REPORT
Dated 3/19/1986

**91.** MOTION FOR ORDER EXPANDING AND ENFORCING THE
COURT'S PRIOR ORDER FOR CERTIFICATION OF CONSTANZA
MATERIAL IN ALL LVMPD FILES;
REQUEST FOR EVIDENTIARY HEARING
Dated 5/6/1986

**92.** LETTER FROM JOSEPH CONSTANZA TO JUDGE WENDELL
Dated 2/7/1987

**93.** TRANSCRIPT OF PROCEEDINGS
Dated 3/17/1987

**94.** LETTER FROM VINCENT PENNABERE TO JUDGE WENDELL
RE: DID NOT REPRESENT COSTANZA
Dated 3/18/1987

**95.** AFFIDAVIT OF THE HONORABLE ADDELIAR D. GUY IIITENDERED IN
SUPPORT OF DEFENDANT'S MOTION TO DISMISS INDICTMENT
Dated 4/2/1987

**96.** MOTION FOR EVIDENTIARY HEARING TO DETERMINE PLAINTIFF'S
COMPLIANCE OR LACK THEREOF WITH DEFENDANT'S DISCOVERY
REQUEST
Dated 4/11/1988

**97.** TRANSCRIPT OF PROCEEDINGS
Dated 4/21/1988

**98.** ORDER GRANTING PETITION FOR WRIT OF MANDAMUS
Dated 8/26/1988

**99.** TRANSCRIPT OF PROCEEDINGS
Dated 10/26/1988

**100.** TRANSCRIPT OF PROCEEDINGS VOL. II
Dated 10/27/1988

**101.** ORDER
Dated 11/21/1988

**102.** TRANSCRIPT OF PROCEEDINGS
Dated 1/9/1989

**103.** TRANSCRIPT OF PROCEEDINGS
Dated 5/9/1989

**104.** TRANSCRIPT OF PROCEEDINGS

Dated 6/27/1989

**105.**  TRANSCRIPT OF PROCEEDINGS

Dated 8/24/1989

**106.**  ORDER

Dated 8/31/1992

**107.**  ORDER FOR REMAND

Dated 11/24/1993

**108.**  MOTION TO DISMISS

Dated 11/29/1993

**109.**  SUPPLEMENTAL FACTS AND POINTS OF AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS HIS INDICTMENT AT THE CONCLUSION OF THE DEFENDANT'S EVIDENTIARY HEARING

Dated 12/21/1993

**110.**  STATE'S EXHIBIT 8: PHOTO OF HILDA KRAUSE

Dated 10/18/1995

**111.**  PETITIONER'S POST-HEARING BRIEF

Dated 2/6/1996

**112.**  PETITIONER'S SUPPLEMENTAL POST HEARING BRIEF

Dated 2/14/1996

**113.**  OPPOSITION TO PETITION FOR POST-CONVICTION RELIEF

Dated 6/24/1996

**114.**  LAPENA'S POST HEARING REPLY BRIEF

Dated 7/11/1996

**115.**  MEMORANDUM: NINTH CIRCUIT COURT OF APPEALS

Dated 10/23/2003

**116.**  ORDER: NINTH CIRCUIT COURT OF APPEALS

Dated 3/14/2016

**117.**  APPLICATION FOR COMPUTATION OF SENTENCE

Dated 4/22/2002

**118.**  NEVADA BOARD OF PARDONS PUBLIC HEARING

Dated 12/12/2003

**119.**  ORDER COMMUTING SENTENCE

Dated 12/12/2003

**120.**  POST-CONVICTION PETITION REQUESTING GENETIC MARKER ANALYSIS OF EVIDENCE WITHIN THE POSSESSION OR CUSTODY OF THE STATE OF NEVADA

Dated 6/10/2011

**121.** TRANSCRIPT RE: STATUS CHECK
Dated 11/10/2015

**122.** LVMPD REPORT OF EXAMINATION
Dated 11/4/2016

**123.** TRANSCRIPT OF EVIDENTIARY HEARING
Dated 1/30/2017

**124.** DECISION AND ORDER
Dated 8/4/2017

**125.** NEVADA SUPREME COURT OPINION, DECEMBER 7, 1998, IN NEVADA SUPREME COURT CASE NO. 29429

**126.** ORDER DISMISSING APPEAL, JUNE 27, 1991 IN NEVADA SUPREME COURT CASE NO. 10009

**127.** NEVADA SUPREME COURT OPINION, APRIL 13, 1982, IN NEVADA SUPREME COURT CASE NO. 10009

**128.** SUPPLEMENTAL REPLY TO PETITION FOR WRIT OF HABEAS CORPUS, NOVEMBER 24, 2014 IN U.S. DISTRICT COURT, COURT CASE NO. CV-S 00-0960-PMP-RJJ

**129.** SUPPLEMENT TO ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS, SEPTEMBER 29, 2014, IN U.S. DISTRICT COURT, COURT CASE NO. CV-S 00-0960-PMP-RJJ

**130.** PETITIONER'S PARTIAL RESPONSE IN OPPOSITION TO RESPONDENT'S ANSWER, IN U.S. DISTRICT COURT, COURT CASE NO. CV-S 00-0960-PMP-RJJ

**131.** ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS, NOVEMBER 14, 2001, IN U.S. DISTRICT COURT, COURT CASE NO. CV-S 00-0960-PMP-RJJ

**132.** MOTION TO DISMISS, FEBRUARY 13, 2001, IN U.S. DISTRICT COURT, COURT CASE NO. CV-S 00-0960-PMP-RJJ

**133.** PETITION FOR WRIT OF HABEAS CORPUS, SEPTEMBER 22, 2000, IN U.S. DISTRICT COURT, COURT CASE NO. CV-S 00-0960-PMP-RJJ

**134.** CROSS-APPELLANT FRANK LA PENA'S REPLY BRIEF, JANUARY 20, 1998, IN NEVADA SUPREME COURT CASE NO. 29429

**135.** APPELLANT'S REPLY BRIEF, NOVEMBER 24, 1997, IN NEVADA SUPREME COURT CASE NO. 29429

**136.** RESPONDENT'S ANSWERING BRIEF, OCTOBER 22, 1997, IN NEVADA SUPREME COURT CASE NO. 29429

**137.** APPELLANT'S OPENING BRIEF, JULY 15, 1997, IN NEVADA SUPREME COURT CASE NO. 29429

**138.** TRANSCRIPT, EVIDENTIARY HEARING, OCTOBER 16, 1995, IN 8TH JD

CASE NO. C59791

139. TRANSCRIPT, EVIDENTIARY HEARING, OCTOBER 17, 1995, IN 8TH JD CASE NO. C59791

140. TRANSCRIPT, EVIDENTIARY HEARING, OCTOBER 18, 1995, IN 8TH JD CASE NO. C59791

141. TRANSCRIPT, EVIDENTIARY HEARING, OCTOBER 20, 1995, IN 8TH JD CASE NO. C59791

142. TRANSCRIPT, EVIDENTIARY HEARING, OCTOBER 19, 1995, IN 8TH JD CASE NO. C59791

143. PETITION FOR POST-CONVICTION, JUNE 3, 1992, IN 8TH JD CASE NO C59791

144. APPELLANT'S REPLY BRIEF, DECEMBER 27, 1990, IN NEVADA SUPREME COURT CASE NO. 20436

145. RESPONDENT'S ANSWERING BRIEF, NOVEMBER 27, 1990 IN NEVADA SUPREME COURT CASE NO. 20436

146. APPELLANT'S SUPPLEMENTAL BRIEF, OCTOBER 11, 1990, IN NEVADA SUPREME COURT CASE NO. 20436

147. APPELLANT'S OPENING BRIEF, JUNE 25, 1990, IN NEVADA SUPREME COURT CASE NO. 20436

148. JUDGEMENT OF CONVICTION, JULY 14, 2009, IN 8TH JD CASE NO. C59791

149. TRANSCRIPT, JURY TRIAL, MAY 9, 1989 IN 8TH JD CASE NO. C59791

150. TRANSCRIPT, JURY TRIAL, MAY 10, 1989 IN 8TH JD CASE NO. C59791

151. TRANSCRIPT, JURY TRIAL, MAY 11, 1989 IN 8TH JD CASE NO. C59791

152. TRANSCRIPT, JURY TRIAL, MAY 12, 1989 IN 8TH JD CASE NO. C59791

153. TRANSCRIPT, JURY TRIAL, MAY 15, 1989 IN 8TH JD CASE NO. C59791

154. TRANSCRIPT, JURY TRIAL, MAY 16, 1989 IN 8TH JD CASE NO. C59791

155. TRANSCRIPT, JURY TRIAL, MAY 18, 1989 IN 8TH JD CASE NO. C59791

156. TRANSCRIPT, JURY TRIAL, MAY 19, 1989 IN 8TH JD CASE NO. C59791

157. TRANSCRIPT, EVIDENTIARY HEARING, DNA PETITION, FEBRUARY 20, 2014

158. TRANSCRIPT, STATUS CHECK, DNA PETITION, NOVEMBER 16, 2015

159. TRANSCRIPT, EVIDENTIARY HEARING, DNA PETITION, JANUARY 30, 2017

160. PARDON,  NOVEMBER 6, 2019

161. ORDER, DNA PETITION, AUGUST 4, 2017

162. E.M. GUNDEISOR LETTER, OCTOBER 26, 2001

163. TRANSCRIPT, PARDON HEARING, DECEMBER 12, 2003

164. TRANSCRIPT, PARDON HEARING, NOVEMBER 6, 2019

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I served a copy of the foregoing, PLAINTIFF'S FIRST
AMENDED COMPLAINT, upon the following persons, via CM/ECF, this Court's mandated
electronic filing system:

Mr. Thomas Dillard, Esq.
Counsel for Clark County and the CCDA Defendants

Mr. Craig Anderson, Esq.
Counsel for the LVMPD defendants

Dated this 5th day of January 2022.

*/s/ Lisa A. Rasmussen*

_____

LISA A. RASMUSSEN, ESQ.